Good morning and welcome to the Ninth Circuit. Judge Thomas and I would like to extend a special welcome to Judge Malloy from the United States District Court for the District of Montana, who is sitting with us today. We are very grateful for your willingness to come and help us with our work. Well, thank you. We'll hear argument first this morning in Scott v. Beregovskaya. Ms. Brown. Good morning, Your Honors, and may it please the Court, Whitney Brown for the appellant. I'd like to reserve two minutes for rebuttal. Your Honors, summary judgment was inappropriate here because there is a genuine dispute as to the subjective awareness of both the nurses, agbasi, and our mentorees, and the doctor, Dr. Beregovskaya. Subject to the Court's questions, I intend first to address the claims involving the nurses and then to address the claim involving the doctor. We believe that five factors, excuse me, five facts create a genuine dispute as to nurse, our mentorees, and agbasi's subjective awareness of a substantial risk of serious harm. First, a jury could reasonably infer that the nurses knew when they encountered Mr. Scott that he had just been in a violent altercation with another inmate named Baloney. Second, the individual with whom Scott had just been in an altercation was standing with an earshot in another holding cell. Third, Scott asked to see a doctor. In fact, he'd asked to see a doctor the previous day when he'd encountered prison medical staff, and it's reasonable to infer that the nurses would have been aware of that previous encounter. Fourth, prisoners live by a code that snitching on another prisoner can result in severe retaliation, including death. Had Mr. Scott told the nurses the truth, that Mr. Baloney's accomplice had stabbed him two days before, he could have been killed. That's undisputed. And what is the evidence that the nurses were aware of the identity of the attacker and that that person was nearby? Your Honors, what the nurse that we think it's reasonable for the nurses to have known is first that there was an altercation. That's evident in the record at ER 114 and 226. Second, they were presented with two individuals standing in adjacent holding cells, one of whom was beaten up. He had abrasions on his face. He was in obvious pain. And so we think it's a reasonable inference that they believed that these two were in an altercation. I don't think that we need the nurses to have known that Mr. Baloney attacked Mr. Scott, and in fact, on the occasion that the nurses saw them, it was sort of a mutual situation. But it's a helpful fact for us if they were aware that these two individuals had had a three-day long sort of encounter. In other words, three violent altercations in three days. And in this appeal, your claims against the nurses are based on their questioning of him with an air shot of the other inmate, correct? That's correct, Your Honor. Thank you. So just the other fact that I would point to, Your Honors, is that the nurses violated prison policy by interviewing him in front of the individual with whom he'd just been in a violent altercation. So taken together and together with the obviousness of the risk of interviewing a prisoner in front of another individual about his medical condition, our position is that the jury could look at the five facts I've just described and infer that the nurses were subjectively aware that interviewing Mr. Scott about his medical condition, again, in front of the person with whom he'd just been in a violent altercation, subjected him to an unreasonable risk that he would not be able to truthfully and accurately convey his medical needs and that a serious medical condition would go untreated as a result. So if you get to pass summary judgment, how do you avoid qualified immunity from the nurses? What's your best case that makes it clear that they violated the Constitution? I think the principle is most clearly articulated in the Hoptowit case, Your Honor. That principle is that prison officials are deliberately indifferent when prisoners cannot make their medical problems known to medical staff. But this principle has come up a number of times. There are two cases with very similar names. The Lemire case is the case where prison staff cleared out of a unit for three and a half hours, and that was determined to be just a very obvious violation of the Constitution. So we would point to Hoptowit. Right. In those cases, and I've read them, they don't quite deal with the circumstances. Is that right? Well, we don't see any daylight between this case and those cases. Defendants try to draw a line in the sand between conditions of confinement cases in our case. We don't see that distinction at all. The point in these cases that I'm pointing to is that prisoners were not able to make their medical problems known to medical staff. In the Lemire case, which is the quiet cell case, prisoners were literally unable to communicate with medical staff because of, you know, barriers between them and the medical staff. And we think this case is just the same. Putting an individual in a circumstance in which telling the truth would require him to risk his life is untenable and anathema to the Eighth Amendment in just the same way that those cases were. All right. Thank you, counsel. You're welcome. I see my time is ticking down, so perhaps I'll switch over to Dr. Beregovskaya. We also believe there's a genuine issue of material fact with respect to Dr. Beregovskaya's subjective awareness of a substantial risk of serious harm. I want to be very clear about two points at the outset. First, we do not dispute that a prison physician is entitled to disbelieve a prisoner who comes in and says one thing and his medical records say another. We don't dispute that. We also don't dispute that at some point Dr. Beregovskaya did not believe Mr. Scott. That's reflected in her medical record. The problem for Dr. Beregovskaya is that she went on to order a radiological test that would have been unnecessary if she truly disbelieved Mr. Scott. In other words, if she believed that he had just been scratched by a fingernail or had an ingrown hair, there would have been no reason for her to order an X-ray of his neck, which was intended, and I quote, to, quote, rule out foreign body. That's at ER 105. There would have been no reason to order any test of any kind. So not only did she order a test, therefore creating a genuine issue as to her subjective awareness of a serious risk of harm, she ordered a test that by her own admission could not identify the harm that Mr. Scott informed her was lodged in his neck, which is a glass or plastic object. Your friends on the other side suggest, I think, that you correctly quoted the rule out foreign body language in the notes, but your friends on the other side suggest that maybe the X-ray was intended in part to diagnose the potential arm problem. What's your response? That is what they say, but that is flatly contradicted by the record. I would point to ER 103. On the top right, it says the X-ray was of left facial. That's here to look at the abrasions. Left orbital, which is the left eye. Right side neck. It says nothing about his arm or his shoulder. And again, you know, ER 105, same deal. Left facial with orbitals X-ray. Right side neck X-ray. Rule out foreign body. So there's just nothing in the record to suggest that the X-rays were intended to diagnose an arm injury. And suppose, I mean, suppose she had thought, you know, well, I don't really believe him. But, you know, it's sort of awkward to say that. So, you know, just to try to, you know, make him feel better, I'll order something. So, you know, you can have an X-ray. It seems odd, then, that she's being punished for trying to be somewhat accommodating. I mean, what's your answer to that? I think two responses, Your Honor. First, if she were trying to be accommodating, she would order the test that would rule out the thing that he was telling her was in his neck, which is a glass or plastic object. So, importantly, she didn't do that. And that's by her own admission in the record. And secondly, I mean, that is an argument that we would fully expect that the defendants would make at trial. And a jury might believe that. But there's another story here. And the fact that she ordered a test creates a genuine issue, we believe, as to her subjective awareness. I see that I'm cutting into my rebuttal time here. I would just point to qualified immunity to the principle that has been reiterated over and over again, that denying or delaying medical care violates the Constitution. This principle is capacious enough, of course, to address many different specific factual scenarios. But that is the principle that we're relying on today. And I'm happy to pick that thread up back in rebuttal. Thank you, Counsel. Thank you, Your Honors. Mr. Ostrich? Ostrich. May it please the Court, Deputy Attorney General Gary Ostrich, appearing on behalf of Defendants LVN Agbasi, RN Armandarez, and Dr. Burgoskaya. The district court's decision granting summary judgment for defendants should be affirmed. The district court correctly found that defendants were not deliberately indifferent to Mr. Scott's medical needs. Furthermore, defendants should be provided with qualified immunity. The nurses provided Mr. Scott with the medical care on February 29, 2016, that they identified as appropriate for the medical concerns that he communicated to them. It's undisputed that when Mr. Scott was complaining about needing to see a doctor for his neck wound, he lied about the cause of the neck wound. And when the nurse examined the neck wound, she reached her own medical conclusion about it based upon her observations of the wound. She consulted with a physician and obtained an antibiotic prescription for the wound. Now, Mr. Scott asserts that the nurses were deliberately indifferent to him because they did not take him from his holding cell to a private location to interview him. He relies on a prison policy that states that nurses should conduct a patient interview in an area affording privacy and free from interruption if possible. Now, a violation of this policy is insufficient to show that they were deliberately indifferent to him because they did communicate with him. They communicated with him for about 20 to 30 minutes, according to Mr. Scott's own admissions, about his injuries and his medical needs. Mr. Scott communicated about his neck wound and even communicated about his arm injury from fighting. The nurses then exercised their professional medical judgment concerning Mr. Scott's appropriate medical care, and Mr. Scott did not provide any objective evidence that the nurses should have perceived his need to discuss his medical problems in private. So the case law that Mr. Scott ---- They were aware that there had been some sort of altercation, weren't they? They would have been aware that they had been fighting because they were put in holding cells, presumably by custodial staff.  So, I mean, why isn't that fact, and your friend on the other side points out the fairly obvious fact that prisoners are not going to want to be seen to be reporting on other inmates to the authorities. Why don't those two facts together lead them to think, like, if we really want to find out what happened to him, we better ask him in private? Because Mr. Scott didn't provide any evidence to them, any clear thing that they could perceive as needing a separate conversation. Well, but that's, I mean, that seems sort of circular, that the reason he didn't say that was because it wasn't private, right? But he was talking to them for about 20 to 30 minutes about his problems. He even talked about his arm injury, which the nurses could reasonably infer was from the fighting. So there's no opposing counsel, sorry, has referred to the fact that the nurses somehow could have inferred from a request the prior day that they wanted to see a doctor. There's no indication that these nurses had any knowledge of that. All they had in front of them was Mr. Scott communicating to them, and they were listening to what he was saying. And therefore, based upon that information, they took, you know, action to treat his medical needs. So in the case law that's been referred to, Hunt, Hobtovitz, and Wellman, they don't provide clearly established guidance in this situation. They're looking at it from a systemic and institutional level, in terms of staffing, in terms of policies and procedures providing effective treatment. There's no clearly established guidance here that nurses would know from that that it would be an Eighth Amendment violation for them to confer with prison inmates about their medical needs in the presence of another prison inmate. Now, Dr. Burgoskaya was also not deliberately different to Scott's medical needs and is entitled to qualified immunity. So Dr. Burgoskaya treated Mr. Scott on an emergency basis after his fight on March 1st of 2016. As Mr. Scott himself asserts, after the fight, he had a laceration on his cheek, and he was bleeding profusely. There are multiple places in the record when he talks about how much he was bleeding. So Scott states in his complaint that the laceration was the main focus point for Dr. Burgoskaya, and it's undisputed that she treated it. Now, Mr. Scott does disagree with Dr. Burgoskaya in terms of the treatment of his neck wound and his arm. It's undisputed, based upon the evidence in the record, that Dr. Burgoskaya perceives Scott as lying about being stabbed in the neck and faking his arm injury. She communicated to him that she thought he was faking it. He got angry about that. And then she wrote in the record that there was, you know, normal range of motion, even though he didn't cooperate. I can give you the exact quote. How does she make a decision not to, I don't trust this guy, he's just lying to me? Because isn't it a physician's responsibility to get a history and to follow up on physical diagnoses? And didn't she make a conscious decision, I'm not going to do it with this guy because he's lying? No, Your Honor. As a record, as Mr. Scott's complaint actually says, when he mentioned these, you know, his neck wound, the doctor looked on the computer and saw that just the day before, he had told the nurses a different cause for his neck wound. So right there the doctor has an objective basis to start to question credibility. Yeah, but then she has two sets of facts. She's got the lie apparently that he told the first day after the first incident. And then what apparently turns out, given a year down the road and he had surgery to remove it, he tells her the real facts. But she consciously said, I'm not going to believe the real facts. I'm going with what he said on day one. Why isn't that a problem for her? Because this goes to subjective intent. She perceived that he was lying because he gave information that contradicted the information he had given before. I mean, you could argue that she could have believed one version as opposed to the other version, but what we have here is that she chose, yes, consciously, based upon what she saw, in addition, based upon her examination of the wound where she saw no entrance wounds and to her it looked like a localized cyst, that she was going to disbelieve him. And as the case law shows from the First, Fifth, and Sixth Circuits, if a person, you know, perceives that the person is lying or faking an injury, then they don't have the subjective state of mind for deliberate indifference to the medical needs. So why isn't that an issue for the jury to resolve instead of summary judgment? Well, in terms of the qualified immunity issue here, I think it's a straight issue of law. In terms of the facts, the facts are non-dispute. You know, she wrote down on her record exactly what she thought. She told him that she thought he was faking his injury. He's communicated that he heard this. But then why, I mean, the fact that she ordered the X-ray doesn't make a lot of sense unless she was at least entertaining the possibility that maybe he really had been stabbed, right? Well, I think there are two things there. First of all, you're basically then arguing that you're violating an Eighth Amendment right of a prisoner by giving him an extra medical test that's not harmful. But I think it's not so much that the extra medical test is a violation. It's that the medical test is evidence from which a trier of fact could infer that she did not, in fact, disbelieve him. I think you need to put it into context. And here I actually need to apologize because I did make a mistake by referring to the X-ray as going to the arm. I took the reference in the medical record to no fractures, to also including the arm there. But the X-ray was also done of the orbits of the face. So that is clearly there in the record. So the X-ray, as you saw in the record, occurred within a short time period. She ordered the X-ray. The X-ray was done within 30 minutes. She had a report within an hour and plus. So she did two X-rays, one of which, yes, could eliminate at least whether or not there was a metal shank. So on, sorry, if you look at ER-256, you'll see that Mr. Scott refers his complaint to the fact that, you know, it does eliminate the idea that it could be a metal shank. Yeah, but didn't they have a conversation where he said, will an X-ray pick that up? Wouldn't a CT scan show? And she made the choice to do with the X-ray when she acknowledged that it isn't going to show plastic or whatever else. If you look at ER-87 and ER-256, you'll see that he asked about that after the X-ray was done. So they've got the X-ray. It shows no formed body. He says, you know, could the X-ray have shown plastic or glass? She admits candidly no. But she makes a decision based upon the totality of the evidence that she's seen there that it wasn't medically indicated to do an MRI. And a mere disagreement between her and Mr. Scott as to whether or not to do an MRI is not a basis for deliberate indifference. Right, but he had that in his neck for a year and it required surgery to remove it, right? It did, but that's not something that she perceived at the time. All right. Thank you, Counsel. Thank you. Thank you, Your Honors. I did not hear today a response to our argument about the sheer obviousness of the risk to which the nurses subjected Mr. Scott of interviewing him in front of an individual with whom he'd just been in a violent altercation, especially whereas here there's no evidence in the record that it would have been impossible or indeed even inconvenient to move him to a private location to have that conversation about his medical condition in private. Farmer says that, quote, a fact finder may conclude that a prison official knew of a substantial risk from the very fact that it was obvious. That is the case here. And in addition, we have the five facts that I presented at the beginning, from which a reasonable jury could conclude that the two nurses were subjectively aware of a substantial risk of harm. And to the extent that my friend on the other side argues that this is different from a staffing or institutional type of case, again, we see no daylight between this case and those. This could very well be categorized as a conditions of confinement case or an institutional issue where medical care should not be provided in a situation that makes a prisoner unable to accurately and fully convey his medical needs. With respect to Dr. Beregovskaya, I respectfully disagree with my friend about when this conversation happened about the glass versus plastic. That happened in their initial conversation where she said, I will order an x-ray, and he said, can that pick up glass or plastic? And she said, no, that's at ER 87 and 256. And I think that's all I have, unless the court has further questions. It appears we do not. So, Ms. Brown, you were appointed by this court to represent your client, Pro Bono, and we thank you for your service to the court. We thank both counsel for their arguments, and the case is submitted.
judges: THOMAS, MILLER, Molloy